No. 1230.  Decided November 29, 1911.

Rehearing denied January 3, 1912.

**1.—Murder—Sufficiency of the Evidence—Malice—Death Penalty.**

Where the evidence showed that the defendant murdered the deceased with malice aforethought, a conviction of murder in the first degree assessing the death penalty was fully warranted.

**2.—Same—Indictment—Race Discrimination.**

Where, upon trial of murder, the defendant, being a negro, moved to quash the indictment because of race discrimination in the selection of the grand jury, but nowhere proved or offered to prove that he was a negro or a person of color and African descent as alleged by him, there was no error in overruling his motion to quash the indictment on this ground.

**3.—Same—Special Venire—Race Discrimination.**

Where, upon trial of murder, the defendant made a motion to quash the special venire because of race discrimination against the negro race in selecting the jurors, but failed to prove or offer to prove that he was a negro or a person of color and African descent, there was no error in overruling this motion.

**4.—Same—Motion to Quash Indictment—Challenge to Array.**

Motions challenging the array of grand jurors must be made at the time the grand jury is empaneled and not afterwards; and any person confined in jail upon his request shall be brought into court to make such challenge; and where the record on appeal showed that no such request was made or that such privilege was denied him, there was no error in overruling a motion to quash the indictment.

**5.—Same—Argument of Counsel.**

Where, upon trial of murder, defendant objected to the language used by the county attorney, which, however, the bill of exceptions showed, the State's

counsel denied having made and the trial court did not hear, there was no re-
versible error.

**6.—Same—Charge of Court.**

Where, upon trial of murder, the evidence did not raise the issue upon which
the requested instructions were asked, there was no error in refusing same.

Appeal from the District Court of Falls. Tried below before the
Hon. Richard I. Munroe.

Appeal from a conviction of murder in the first degree; penalty,
death.

The opinion states the case.

*Nat Lewelleyn,* for appellant.—On the question of race discrimina-
tion: Carter v. State, 48 S. W. Rep., 508; Whitney v. State, 56 S.
W. Rep., 69; Carter v. State, 177 U. S., 442; Va. v. Rives, 100 U.
S., 313.

On question of court's failure to charge on inadequate cause: White
v. State, 18 Texas Crim. App., 57; Irvine v. State, 20 Texas Crim.
App., 12; Wimberly v. State, 22 Texas Crim. App., 506; Patton v.
State, 62 Texas Crim. Rep., 71, 136 S. W. Rep., 459.

*C. E. Lane,* Assistant Attorney-General, and *Frank Oltorf,* County
Attorney, for the State.—On question of race discrimination: Carter
v. State, 46 S. W. Rep., 236; Smith v. State, 56 S. W. Rep., 54;
Pollard v. State, 58 Texas Crim. Rep., 299, 125 S. W. Rep., 390.

PRENDERGAST, JUDGE.—On January 14, 1911, the grand jury
of Falls County, Texas, indicted the appellant for the murder of Rosa
Tubbs, alleged to have been committed on September 6, 1910. The
term of court at which the indictment was returned convened in Janu-
ary 9, 1911. The law requires, and we assume that it was done at
this time, that the grand jury be duly impaneled on the first day of
the term of court. From the record we gather that perhaps on the
same day of the killing, if not, only a day or two later, the appellant
was arrested by the sheriff of Falls County, and placed in the jail of
that county and kept confined therein until his trial, which occurred
on February 7, 1911. On his trial, he was convicted of murder in the
first degree, and the death penalty inflicted.

The evidence, without contradiction, shows that the deceased was
an unmarried woman about twenty-five years old; that she had four
illegitimate children, the last one being born in the summer of 1910;
the exact time does not appear. For sometime prior to the killing,
she and her three children lived with her married sister. The appel-
lant also lived with this sister. There were four rooms to the house.
One was a kitchen, the other three bed rooms. The appellant stayed
in one of these bed rooms; the deceased and her children in another,
and her sister and brother-in-law in the other. The deceased went to
this sister's house sometime in about January, 1910, and continuously

lived therein until after the birth of her last child in the summer of 1910. The sister and brother-in-law denied that appellant "kept" her while there. One of the witnesses testified that the deceased claimed that one Jones—not the appellant—was the father of the illegitimate child which was born while she was living at her sister's in the summer of 1910. No one testified, and the record does not disclose that appellant was the father of that child.

The appellant is shown to have been very anxious to marry the deceased, and that while she stayed at her sister's, she agreed to marry him as soon as she recovered after the birth of that last child. That while she was there the appellant looked after her and supported her. As soon as she recovered from the birth of the child, she refused to marry the appellant, and removed from her sister's, where she gave birth to the child, and where she had been staying, some miles distant, the exact distance not disclosed. The appellant claimed that she owed him about fifty dollars for what he expended for her while she was at her sister's awaiting the birth of her child; she disputed this, claiming that she owed him only $4.50.

The deceased left her sister's, where she and appellant had been staying, on Friday before the killing on the following Tuesday, about noon. On Monday, appellant told deceased's sister, where he was staying, in the presence of her husband and another sister of deceased, to go over to where the deceased was and tell her to come home, and if she did not come home he was going to kill her. This sister, on that day, went to the deceased and delivered appellant's message. On Monday night, the night of the same day, appellant himself got in his wagon, went from where he was, over to where deceased was, hunted her up, called her out of the house where she was, and after each spoke to the other, he told her that she had not kept her promise to marry him. She replied, "I know I promised to marry you, but you told me my ways don't suit you, so it is best for us not to marry." He then asked her what she was going to do about what she owed him. She asked him how much she owed him, and he replied, about fifty dollars, he reckoned. He then left her, bidding her good night, and stated that he would be back over there the next day. The next day he did go back over there with his wagon, armed with a six-shooter concealed about his person. He reached where she was sometime in the morning of Tuesday, stayed around about where she and others were picking cotton, and talked to her and them. He remained about them for some hours, and until the deceased and others started off and to the house to get their dinners. The question again came up between them about her promise to marry him. She admitted that she had made such a promise, but that she was not going to marry him, and after canvassing this matter between them she definitely announced to him that she refused to marry him or go back to where he was. The question also of what she owed him was again discussed, he claiming she owed him about fifty dollars, she claiming that she

owed him only $4.50, and at that time she made arrangements with her employer, in appellant's presence, to pay him what she admitted she owed him. She then started off to the house with others to get her dinner. In going to the house it was necessary for the parties to go through a wire fence. When the deceased and others started off, appellant followed her. After getting through the fence, only a short distance from where they had been conferring, he said to her: "Didn't you promise to marry me? Ain't you going back up yonder with me?" She replied, "No, I ain't going back up yonder any more." He said, "I am going to kill you," and reached for his pistol. She threw up both hands and ran. He took after her, having some trouble in extricating his pistol, and did not do so until he ran her several steps. After he got his pistol out, he ran up to her, she running and screaming, put the pistol almost against her back and shot her. He was so close when he fired this shot that the flame from the pistol caught her clothing afire and it blazed up. Some of the witnesses, soon after she fell from the effect of this shot, had to take water and pour on her clothes to extinguish the fire. When she fell, the appellant walked around to her head, which she raised up apparently to look at him; he thereupon put the pistol close to her head or neck and fired again, striking her in the neck, and killed her instantly.

There were several eyewitnesses to the killing. There was no dispute as to the facts of the killing. There were also several eyewitnesses who heard the conversations between the appellant and the deceased that day, and also the preceding night when he went to see her. The appellant himself did not testify. After the killing he got in his wagon and went back to where he was staying at the deceased's sister's. Upon reaching the place, he met some persons to whom he told that he had killed the deceased. The parties not believing him, exclaimed to him, "Oh! you have not." He replied, "Yes, I have, I broke her neck. I am satisfied she is dead." While he was telling this to one of the witnesses, another came up and heard it, and said to him, "Yes, you have killed her." He replied, "Well, here I am; I tried to phone for Mr. Pool (who was the sheriff of Falls County); I have killed her and I am sorry I done it, but I had it to do." He further said that he was a good, able-bodied man and they could hang him if they wanted to or he could work it out. He said, "I am going to turn myself over to the law." That he "had promised himself that he would do it (kill the deceased) if he had to."

We think the evidence, without doubt, shows that the appellant murdered the deceased with malice aforethought; that he had deliberately planned to kill her if she refused to marry him; had so threatened and sent her word, and after thus determining in his own mind while he was calm and long before the killing, he deliberately, willfully and with malice aforethought, executed his previously formed design and threat and killed her in a cruel manner.

On February 6, 1911, before the trial was had on the next day, the

appellant made two motions, one to quash the indictment, alleging as grounds therefor, that he, the appellant, was a negro, a person of African descent. And that the jury commissioners appointed to select the grand jury, which found and presented the indictment against him, selected no person or persons of African descent known as negroes, to serve on the grand jury, but on the contrary, did exclude them therefrom. That the grand jury was composed exclusively of white persons, and while about one-fourth of the population and of the registered voters in Falls County were negroes or persons of African descent and who were qualified to serve as such grand jurors, they were excluded therefrom on the ground of their race and color, and have been so excluded from serving on grand juries in said county for a great many years, which is a discrimination against the defendant, and that such discrimination is a denial to him of the equal protection of the laws and of his civil rights guaranteed by the Constitution of the United States. This is in full, substantially, the allegations of appellant in this motion.

He also, at the same time, made a motion to quash the special venire summoned to try him in this particular case on substantially, if not literally, the same grounds as the other motion above stated to quash the indictment. In each of these motions he concludes them with this: "all of which the defendant is ready to verify," and signs and swears to each motion before the clerk of the court.

The bill of exceptions to the action of the court in overruling both of these motions shows that in the bill, he quoted each of his said motions, and that he introduced and that the court heard certain evidence on each of said motions, which was all of the evidence that he introduced or offered to introduce on the subject.

Under our law, at each term of the District Court, the judge thereof is required to appoint three competent persons as jury commissioners who are to select grand and petit jurors for the next term of such court. In selecting grand jurors, they are required (art. 378, Code of Criminal Procedure) to select no person who does not possess the following qualifications: "1. He must be a citizen of the State and of the county in which he is to serve, and qualified under the Constitution and laws to vote in said county. . . . 2. He must be a freeholder within the State or a householder within the county. 3. He must be of sound mind and of good moral character. 4. He must be able to read and write. 5. He must not have been convicted of any felony. 6. He must not be under indictment or other legal accusation of theft, or of any felony."

None of our laws would require, authorize or permit any discrimination whatever in favor of or against any race of people in the selection of either grand or petit jurors. It is unnecessary to quote our statutory provisions as to the duties of jury commissioners or the qualification of either grand or petit jurors, but we state that in the selection of petit jurors to try cases and in capital cases as this was,

substantially the same qualifications for petit as for grand jurors are required under our law to be selected.

The appellant in this case offered only one of the three jury commissioners to testify upon the hearing of his motions. This one witness, W. W. Turner, on the hearing of these motions, testified: "My name is W. W. Turner. I was on the jury commission that selected the present grand jury and petit jury. I do not know that we all selected any negroes on the grand jury. We took the list and went over it. I believe Mr. Pool furnished us the poll list. We had a poll list, and wherever we came to where one was marked colored, we did not put his name in the hat to be drawn. We were told that we were to select a certain number of names to put in the hat for the jury to be drawn from, so many names for each week for this term of court, and a hundred and fifty special veniremen, I believe. We had the list, and wherever we came across one that was marked colored, we did not put his name in the hat. We discussed the question as to whether we would put them on or not, and we thought under the circumstances and conditions, possibly, that it would not be exactly right. You know juries have to be tied up together, and we did not care to mix them up. We intentionally left them off.

Cross examination: "We were instructed to select good men. In selecting the grand jury, we tried to get representative men from different parts of the county. I tried to select the ones on this side of the river, and they were to get the ones on the other side. In selecting those on this side of the river, the purpose in my mind was to select good men who would do their duty, regardless of anything else. My purpose was to select good, law-abiding citizens. In selecting the grand jurors, we never looked at the poll list. We merely got to work. We selected the grand jurors, because we thought they were good, law-abiding citizens, and representative men in the community. We did not consider any man who was a good, law-abiding man, and refuse him because he was a negro. When we got the grand jury, I never thought anything about that. The only thing we considered in getting the grand jury was whether they were the right kind of men to compose a jury, or not. It did not enter into my mind as to whether or not we would put a negro on the grand jury. There was no discrimination about that. There was nothing said about the negro at all. In selecting the grand jury, there was no discrimination in my mind between the black and white race. We just wanted to get from different communities, those men who would make good grand jurors. That was just the question in my mind. It was what I had in my mind, and I selected them. It was in my mind to select good men on both the grand jury and the petit juries. It might have been in my mind that the negro would not make as good a juror as a white man would.

"It was not because I wanted to discriminate against the negro. There was not any intention in the world in my mind to discriminate

against the negro. It was our intention to get representative men who would make good jurors."

Redirect examination: "At the time we selected the grand jury, there were one or two men in Rosebud on it that I did not know, but since the grand jury was in session, I have become acquainted with them. I know the ones personally that were drawn by Mr. Kirkpatrick and myself. I knew there were no negroes drawn on the grand jury, because we discussed that beforehand. I do not remember whether we discussed that question before we drew the grand jury or not. I think we drew the grand jury first. To the best of my recollection, the grand jury was drawn first, that is, we had drawn, I believe, sixteen men. If I am not mistaken, we drew sixteen names. We had this discussion before we reported them. Then, after the grand jury was drawn, Mr. Poole presented us with a poll list, and also the road overseer's list. We tried to select men from different portions of the county. Wherever we came across a man's name that had the letter 'C' following it we did not put that name on the piece of paper and drop it in the hat to draw from. In other words, we kept out all colored people intentionally.

"Recross-examination: I stated that we did not discuss this proposition until after the grand jury was selected. We did not discuss it with reference to the selection of the grand jurors.

"Redirect examination: I am not certain about that. It is not clear in my mind."

Upon being recalled by the State, he testified:

"As I stated before, whenever we found a man's name followed by the letter 'C,' we left his name off. If there was a negro drawn, it was because the party in making up the poll list had forgotten to put the letter 'C' after it. I believe I made the statement that we were trying to select men whom we thought to be good men. We did not think it would be advisable to have them mixed.

"I have been living in this county about seventeen years. I do not know how many negroes there are in this county who are qualified jurors. There are about from ten to fourteen hundred who usually pay their poll tax. I really do not know how many paid their poll tax last year. In looking over the poll list, we ran across them frequently. We thought possibly it would be unpleasant to both parties to mix them on the jury. The reason we did not draw them on the petit juries was that we thought possibly it would be unpleasant for the jurors, and not a bit because we had anything against the negroes. We were not trying to do the negro an injustice. We did not think of trying to deprive him of any rights at all. If we had thought of that, we might have drawn him a juror.

"A little over forty-five hundred poll taxes was paid in 1909. There were four thousand seven hundred and eighty-one poll taxes paid in this county last year, the year ending January 31st, 1910. I do not know how many negroes paid their poll tax that year, but there were

about twelve or thirteen hundred. The year that fourteen hundred paid their poll taxes was two years following the local option election. The local option election was in 1904, I believe.

Appellant introduced another witness, George H. Carter, who testified that he was county attorney of Falls County for four years, not stating when this was. That while he was such county attorney, he was with each grand jury, and he had no recollection of a negro being on any of the grand juries while he was county attorney.

He introduced another witness, Tom Connally, who testified that he was county attorney of Falls County for four years, not stating when this was. That while he was county attorney there was no negro on any of the grand juries that he could recall; he thought there was some on the panel, but he did not think any of them ever served as a grand juror. He was not positive about any of them being on the panel, but thinks once or twice they were on the panel, but not selected.

He introduced another witness, W. H. Barnhill, the tax assessor of Falls County, who testified that he expected there were approximately a thousand negroes who paid their poll tax last year, (1910); that lots of them paid property tax, too. That there were a good many negro schools in the county; he did not know about how many; that some of these negroes could read and write; that the percentage of them who were land owners was small; that a lot of them owned their own homes; that there was a good percentage of them who were neither householders nor land owners. He would not pretend to say what percentage of the negroes in the county were able to read and write. He was sure that there were lots of them who paid their poll tax who were able to read and write for the reason that they signed their names to their renditions. That he thought he knew Edmond Brown; that he thought he was a negro; he knew of no other Edmond Brown in the county.

He also introduced C. W. Bratton, the tax collector of the county, who testified that he did not know how many negroes paid their poll taxes for 1910. He had no idea and could not do anything but guess at it. He thought there were not as many who paid their taxes in 1910 as did in 1911. That it would take him three or four days or a week to go through his tax rolls to approximate the number of negroes who paid their poll tax in 1911.

He also introduced Mr. Eddins, the county superintendent of public schools in Falls County, who testified that there were forty-eight negro schools in the whole county; that a few years before, when the law authorized negro trustees for these schools, they found trustees who could read and write. He did not know what percentage of the negroes in the county could read and write; that the average negro leaves school about the fourth grade, when they are twelve or fourteen years of age. That there were more negro schools in the county ten years before that time than there were at the time he was testifying; that

the negro population in the county has decreased instead of increased. There were not as many negro children as there were twenty years before, but there were about the same number in the schools now that were there about six years before. That there were about three thousand or thirty-five hundred negro children in the county, and about seven thousand white children. He did not know how many qualified negro voters there were, nor how many qualified negro jurors there were in the county. He could not even make a guess at how many could read and write.

He also introduced Frank Oltorf, county attorney of Falls County at that time, who testified that he knew a negro named Edmond Brown; that he came to his office several days before the trial and told him he was summoned as a special venireman in the John Oaks case, which was pending then on the docket of said District Court, in which the defendant therein, a negro, was charged with murder; that Edmond Brown is a negro, and that the venire in this case, appellant's case, was drawn from the list of names drawn by the same jury commissioners that drew the grand and petit jurors for this term of court. That said Edmond Brown, a negro, was the only man of that name in the county that he knew.

We have thus given in full the testimony of Turner, the only one of the three jury commissioners who testified on the hearing of said motions, and we have given the substance of the testimony of each of the other witnesses. This is all of the testimony introduced by appellant on his said two motions and all that was offered to be introduced by him on the hearing thereof.

From this testimony it will be seen that the appellant nowhere proved or offered to prove that he was a negro or a person of color and African descent as alleged by him. It is just as essential for him to prove this fact, if it be a fact, as it is for him to prove, if he could, that the negro race to which he belonged, if he did, had been discriminated against because and solely because of race prejudice. Neither of his motions, even though sworn to, was offered in evidence, nor would they be competent evidence unless agreed to be used as such by the representative of the State on the hearing of these motions. In this case they were not so offered, nor agreed to be considered as evidence therein. And as the evidence offered wholly fails to prove appellant's allegations in his motions, the court did not err in overruling both of them.

The State contends in this case that the testimony of Turner, taken as a whole, does not show that negroes were excluded from either the grand or petit jury, because of prejudice against that race, and contends that the testimony of Turner, taken as a whole, did not require the court to find that there was any exclusion of the negroes from the grand or petit jury solely because of race prejudice, the State contending that while the testimony of the witness, Turner, on direct examination, might justify or require the court to so find, but in the

very next breath he testified to such a state of facts as would rather exclude the idea that the jury commissioners excluded negroes solely because of race prejudice against them. The State also contends that as the burden to prove these allegations by appellant in his motion was on him, and as the court heard the witnesses, saw their manner of testifying, was justified in overruling the motions, because the appellant had not proven his allegations of race prejudice. There is much force in the State's contention. We are not advised by the record whether the court, after hearing the testimony, found against appellant on that issue or not. It is unnecessary for us now to pass upon it, for, as stated above, the appellant clearly did not show by any evidence introduced or offered to be introduced, that he was a negro or belonged to the African race. Of course, if it should have been shown that he was a Mexican, for instance, or belonged to any other race than to the negro race, his motions were properly overruled, the burden being on him to show this, if he could, and his failure to do so would require the court to overrule his motions.

Besides this, his motion to quash the indictment clearly was not within time. Our law requires that motions challenging the array of grand jurors shall be made at the time the grand jury is impaneled, and not afterwards, and that any person confined in the jail, upon his request, shall be brought into court to make such challenge. The record shows with sufficient certainty that the appellant was arrested, as stated above, either on the day of the killing, or the next day, September 6, 1910, and that he was confined in the county jail at the county seat where the court was held, and the grand jury impaneled, from that time continuously until the indictment was found on January 14, 1911, and he does not show or claim that he was denied this privilege, or that he asked it, and hence his motion to quash the indictment was properly overruled on that ground. Articles 397, 599 and 561 of the Code of Criminal Procedure. Martin v. Texas, 200 U. S. 316; Franklin v. South Carolina, 218 U. S., 164; Brownfield v. South Carolina, 189 U. S., 428; Carter v. Texas, 177 U. S., 442; Smith v. Mississippi, 162 U. S., 592; Williams v. Mississippi, 170 U. S., 213,

Appellant's third bill of exception is to the effect that on the trial of this cause, while the assistant county attorney was delivering his opening speech, he denounced the defendant as a brute and fiendish criminal. That the appellant then and there objected to such epithets being applied to the defendant, and requested the court to instruct the jury not to regard said statements of the assistant county attorney, but claims that the court refused this, and allowed the attorney to proceed with his argument, to which appellant excepted because such language was calculated to inflame the minds of the jury. There is also in the record a refused special charge requested by appellant, to this effect: "You are instructed that counsel for the State should not apply epithets to defendant and said counsel should not have called

defendant a brute or a fiendish criminal, or that he is a fiend, and you will not consider said argument for any purpose." The court, in allowing the bill of exceptions on these grounds, qualified it as follows: "I was busy preparing the charge while Thomas Bartlett, Esq., was making the opening address in the case. His speech occupied hardly ten minutes and I heard no part of it. When the objection was made by counsel for the defendant to the remarks complained of, Mr. Bartlett denied making them and as I did not hear them, I gave the jury no instructions on the subject. The explanation of the bill of exceptions refusing to give the written charge requested by the defendant on this point is referred to and made a part of the explanation of this bill. I am quite sure what Mr. Bartlett said in his address to the jury did not influence them one way or another, although I would have instructed the jury as requested if I had heard any such remarks as those complained of, made by Mr. Bartlett, and would have done so anyhow had he not denied making the remarks in his address complained of." Under the circumstances, no reversible error is shown in this manner.

The only other bill in the record is to the refusal of the court to give another requested charge by appellant to the jury. This requested charge is as follows: "You are instructed that if you believe from the evidence that the defendant, Dan McCline, killed Rosa Tubbs, but believe he went to the field of Mr. Case for the purpose of persuading her to go home with him, and that on her stating to him that she would rather die than marry him, he, the defendant, became enraged and in the heat of passion, caused by her acts and words, shot deceased, then you can not find the defendant guilty of murder in the first degree, and if you have a reasonable doubt thereof, you will give him the benefit of it, and not convict him of murder in the first degree." In approving this bill, the court qualified it as follows: "The witness, Edy Dickens, who was present at the time of the shooting, said that: 'Rosa and Dan and I left the wagon together—we were going to the house for our dinner; we got up to the wire fence and got through the fence. He says, 'Didn't you promise to marry me?' He says, 'Ain't you going back up yonder with me?' She says, 'No, I ain't going back up yonder any more.' He says, 'I am going to kill you,' and reached for his gun. Mr. Case, while standing with deceased and defendant at the wagon, testified: 'That Dan said something to Rosa about going back and working out the money—he wanted her to go back and work it out. She told him no, that she would die before she would go back up there; she never intended to go back up there any more. After that they walked off together.' W. E. Case testified that to the place of the killing from where the wagon stood and the conversation was, Case testified about was a hundred yards or little more."

As we understand this qualification by the court, it was intended to show that the evidence did not call for or justify such a charge as appellant requested. After a careful consideration of the evidence in

this case, we believe the evidence did not raise any such issue, and that the court was justified in refusing to give ·the special charge requested.    The evidence does not raise the issue, hence there is no reversible error shown in the refusal to give this special charge.

There are no other questions raised or presented in the record requiring any further discussion by us.

There being no reversible error in the record, the judgment will be affirmed.

*Affirmed.*

[Rehearing denied January 3, 1912.—Reporter.]