## CARL OLIVER v. THE STATE.

### No. 2260. Decided April 23, 1913.

### Rehearing denied June 4, 1913.

**1.—Murder—Indictment—Race Discrimination—Change of Venue.**

Where, upon trial of murder, defendant moved to quash the indictment because of race discrimination in the selection of a grand jury, after the venue thereof had been changed, and besides, it did not appear that the motion alleged that defendant was a negro nor was this proved, there was no error in overruling same. Following McCline v. State, 64 Texas Crim. Rep., 19, and other cases; besides, no race prejudice was proven. Following Villa v. State, 63 Texas Crim. Rep., 537.

**2.—Same—Evidence—Bill of Exceptions—Latitude in Questioning Witnesses.**

Where the bill of exceptions to the action of the court in sustaining objections to defendant's question to the witness, upon hearing the issue of race discrimination, failed to state what the answers of the witnesses would have been, the same could not be considered on appeal; besides, ample latitude was given by the court in propounding questions to witnesses.

**3.—Same—Continuance—Illness of Defendant—Want of Diligence.**

Where defendant's fourth application for continuance contended that he was too sick to go to trial, and also for the want of a witness, which was contested by the State, and it was shown that neither ground was well taken, there was no error in overruling the motion, both on the ground that defendant was not too unwell to go to trial, and that he had not used proper diligence to procure the attendance of the absent witness; besides, he could have proved the same facts by other witnesses in attendance.

**4.—Same—Trial Judge—District Court—Court House—Absence of Defendant.**

Where, upon trial of murder, it appeared that the regular district judge was disqualified to try the case, and that another district judge sat in exchange on the trial of the case in the same courthouse where the regular judge was holding court, but in a different part thereof, a motion to quash the special venire on the ground that it was drawn by said exchange judge in the office of the clerk of the District Court in said courthouse while the regular judge was trying a civil case in the courtroom of said courthouse, and also because the defendant and his attorney were not present at the drawing of said special venire, was correctly overruled, and there was no error in the court's action.

**5.—Same—Confessions—Evidence—Voluntary Confessions—Questions and Answers.**

Where defendant's confessions were in writing in accordance with law, and it was shown that they were voluntarily made, a contention that they were made in answer to questions propounded by the officer was correctly overruled; besides, this objection is not disclosed in the bill.

**6.—Same—Evidence—Declarations of Third Party—Hearsay.**

Upon trial of murder, the declarations of a third party as to the motive of the defendant in killing deceased because he was intimate with defendant's wife were correctly excluded, as it was shown that said third party was not present at the time of the homicide, and that his declarations were hearsay.

**7.—Same—Evidence—Flight of Defendant.**

Where, upon trial of murder, defendant attempted to counteract evidence of his flight by offering to show that the sheriff's wife told her husband sometime after the killing of the deceased that some one called for him, the same was correctly excluded as hearsay, as she did not know who it was that called her husband; having been permitted to testify that many people called and were told by her that the sheriff was not there.

**8.—Same—Evidence—General Reputation for Unchastity.**

Where, upon trial of murder, defendant's wife was not offered as a witness by either side, there was no error in the court's ruling excluding testimony as to her general reputation for unchastity.

**9.—Same—Evidence—Res Gestae—Declarations of Third Party.**

Where, upon trial of murder, the State sought to show that defendant waylayed deceased and assassinated him while the latter and others were trying to take defendant's wife to the house of the sheriff in the night-time to protect her against the assaults of the defendant, and offered such testimony to counteract the contention of the defendant that he killed deceased because he found him in compromising relations with defendant's wife, there was no error in permitting the State to introduce declarations of a third party who was with deceased, to the effect that just before the killing he loudly called the defendant's wife to come out of her room and go to the sheriff's house, it having been shown that defendant was near enough to hear and see what was going on at the time; the court properly limiting this testimony and instructing the jury that unless they believed beyond a reasonable doubt that defendant heard said declarations to disregard it. Following Lagrone v. State, 61 Texas Crim. Rep., 170.

**10.—Same—Special Venire—Jury and Jury Law—Swearing Deputy Sheriffs.**

Where defendant moved to quash the first special venire because eighty men were drawn and fifty-four of those summoned, and only ten of those who had been summoned answered the call, and it appeared from the record that some of the jurors were properly excused, some dead, and some out of the State; that defendant in no way sought any attachment to bring in the special veniremen who were summoned and did not attend; that no objectionable juror was forced upon the defendant, and that his peremptory challenges were not exhausted, there was no error in the court's action ordering the summoning of

fifty talesmen by regularly sworn deputy sheriffs, and it was unnecessary to swear such deputies again. Following Habel v. State, 28 Texas Crim. App., 588.

**11.—Same—Charge of Court—Words and Phrases—Sufficiency of Evidence.**

Where defendant's complaints to the charge of the court of various words and phrases therein contained were more than ordinarily hypercritical, and the said charge submitted every issue in a proper manner including his theory of defense, there was no error; the evidence being sufficient to sustain a conviction of murder assessing the death penalty.

**12.—Same—Charge of Court—Requested Charges.**

Where, upon trial of murder, the court covered every ground where defendant requested special charges by his main charge, so far as any of such special charges were correct, and only refused such which were not raised by the evidence, there was no reversible error.

**13.—Same—Misconduct of Jury.**

Where, upon trial of murder, defendant's motion for new trial claimed misconduct of the jury in discussing a certain case not before them after their retirement and while they were considering the case, but it was shown that such misconduct or any other did not occur, there was no error.

**14.—Same—Sufficiency of the Evidence.**

Where, upon trial of murder and a conviction assessing the death penalty, the defendant's guilt was shown beyond a shadow of a doubt under a proper charge of the court, there was no reversible error.

Appeal from the District Court of Grayson. Tried below before the Hon. J. M. Pearson, sitting in exchange.

Appeal from a conviction of murder; penalty, death.

The opinion states the case.

*J. T. Cunningham* and *A. L. Lewis*, for appellant.—On question of race discrimination: Texas & Pacific Ry. Co. v. DeMilley, 60 Texas, 194; Smith v. State, 69 S. W. Rep., 151; U. S. v. Gale, 109 U. S., 65; Carter v. State, 177 U. S., 442; Leach v. State, 62 S. W. Rep., 422; Lewis v. State, 59 S. W. Rep., 1116; Smith v. State, 58 S. W. Rep., 97.

On question of continuance: Whitney v. State, 59 S. W. Rep., 895; Streight v. State, 62 Texas Crim. Rep., 453, 138 S. W. Rep., 742.

On question of the district judge drawing a special venire in the district clerk's office while another court was sitting in the same courthouse: Daniel v. Bridges, 73 Texas, 149.

On question of summoning special veniremen: Shaw v. State, 32 Texas Crim. Rep., 155; Sanchez v. State, 39 id., 389.

On question of explaining flight: Arnold v. State, 9 Texas Crim. App., 435; Francis v. State, 7 id., 501; Campbell v. State, 15 id., 506.

On question of reputation of defendant's wife for unchastity: Gregory v. State, 50 Texas Crim. Rep., 73, 94 S. W. Rep., 1041.

On question of declarations of third party calling defendant's wife: Mo. Pac. Ry. Co. v. Porter, 73 Texas, 304; U. S. v. Ross, 92 U. S., 281; Manning v. Insurance Co., 100 U. S., 693.

On question of modification of bill of exceptions: Blain v. State, 34 Texas Crim. Rep., 448.

On question of lying in wait: Gregory v. State, supra; Price v. State, 18 Texas Crim. App., 474.

On question of mistake: Patrick v. State, 78 S. W. Rep., 947; Giddings v. State, 83 S. W. Rep., 694.

On question of court's charge as to deceased's conduct with defendant's wife: Marshall v. State, 40 Texas, 200; Farrer v. State, 42 id., 265; Gregory v. State, supra.

*C. E. Lane,* Assistant Attorney-General, and *Wilkinson & Wilkinson,* for the State.—On question of race discrimination: McCline v. State, 64 Texas Crim. Rep., 19, 141 S. W. Rep., 977; Gibson v. State, 53 Texas Crim. Rep., 349, 110 S. W. Rep., 41; Washington v. State, 51 Texas Crim. Rep., 542, 103 S. W. Rep., 879; Adkins v. State, 65 S. W. Rep., 924; Thomas v. State, 49 Texas Crim. Rep., 633, 95 S. W. Rep., 1069; Hubbard v. State, 67 S. W. Rep., 413; Martin v. State, 72 S. W. Rep., 386.

On question of admitting declarations of third party calling defendant's wife: Maxey v. State, 66 Texas Crim. Rep., 234, 145 S. W. Rep., 952.

PRENDERGAST, JUDGE.—Appellant was convicted of murder in the first degree and the death penalty inflicted.

The contention and theory of the State was that the offense was murder in the first degree; that it was clearly upon express malice, and that the appellant was lying in wait,—in effect, that it was an assassination. Among others, it was the theory and contention of the appellant that the killing was justifiable in that the appellant, at the time, believed that the deceased and his wife, who were together, were then going to a place for the purpose of having sexual intercourse, and that the killing was in self-defense. At most, he contends that it was only manslaughter. The evidence was ample, full and sufficient to establish the State's contention of murder in the first degree.

Appellant made a motion to quash the indictment, because in the selection of the grand jury which indicted him an unlawful discrimination was made against him because of race prejudice; that in selecting the grand jurors the commissioners excluded negroes from the grand jury because of their race and the prejudice against their race.

The judge heard much evidence on this motion. He heard all the witnesses orally, saw their manner of testifying and the manner of their examination and cross-examination, and even if there was a conflict in the evidence he was in a much better position and much better qualified than the judges of this court,—who have that testimony in a statement of facts merely written down,—can possibly be to determine such question of fact.

The killing occurred on the night of June 29, 1910, about or just before 10 o'clock. The term of the District Court at which the jury commissioners were appointed to select grand jurors for the October

term, 1910, was held and they made the selections at the April term, 1910, long before this killing occurred. Of course, their selection and action could not have contemplated the indictment of the appellant. The indictment was found by the grand jury of Franklin County, in which the killing occurred, at the October term, 1910, on October 17, the day on which the term began, and was properly returned in, and filed in the court on that day. The appellant was then under arrest held in the jail of some other county, not shown, because of the fear of mob violence if he had been attempted to be kept in the Franklin County jail. Some time during October 19, 1910, he was quietly taken from where he was held into the open court of Franklin County. The judgment of the District Court of Franklin County, of date October 19, 1910, among other things, after stating the said cause, number, court and date, is: "The above entitled and numbered cause having this day been called for trial, appeared the parties, the State by her district attorney, and the defendant in person and by attorney; and the defendant's preliminary motions, exceptions and special pleas filed herein having been heard and disposed of by the court, the defendant was duly arraigned and required to plead to the indictment herein, whereupon the defendant, Carl Oliver, in person, in open court, pleaded 'not guilty' to said indictment, which plea was then and there entered upon the minutes of said court. And the judge presiding being satisfied that a trial alike fair and impartial to the accused and the State can not be had in this, Franklin, County, on account of the state of public feeling against defendant. If tried here he would be lynched. Since his arrest he has been kept away from here to keep him from being lynched. He is charged with killing a white man. He was quietly slipped in here last night to be present and is immediately taken away to prevent a lynching. The lynching can not be prevented by a change of venue to any county in this judicial district, nor to any county to an adjoining district; thereupon he, the said judge, of his own motion now here orders that the venue of said case be changed to Grayson County, Texas." The order then continues, properly changing the venue from Franklin to Grayson County and required that he be delivered to the sheriff of Grayson County immediately.

Our law authorizes the judge to change the venue to any county in the State, on his own motion or judgment. C. C. P., article 626. It also says: "But, in all cases before a change of venue is ordered, all motions to set aside the indictment, and all special pleas and exceptions which are to be determined by the judge, and which have been filed, shall be disposed of by the court, and, if overruled, the plea of not guilty entered," before the venue is ordered changed. Article 630, C. C. P. Notwithstanding this, and the statement above quoted in the order changing the venue, after the case had reached and been properly filed in the District Court of Grayson County, the appellant, on November 21, 1910, in the District Court of Grayson County, filed his motion to quash the indictment alleging of the race prejudice above stated.

And, as stated above, the court on November 21, 1910, heard the said motion and all the evidence thereon and then overruled the same, to which appellant excepted. Appellant's motion to quash on said ground was not sworn to and *it did not allege that appellant was a negro.* It is not only necessary for the motion to allege, when this is the ground to quash the indictment, that the appellant was a negro, but to prove it, as has been held by this court, and many times by the United States Supreme Court. McCline v. State, 64 Texas Crim. Rep., 19, 141 S. W. Rep., 977, and authorities there cited. The State by proper proceedings denied all of appellant's allegations in said motion and contested it in every way.

We have carefully read and considered the whole statement of facts and evidence heard by the court on this motion. Without reciting it, we are clearly of the opinion that not only did the appellant fail to prove that there was any race prejudice in the selection of the grand jury that indicted him, but that the State proved as a fact that there was no prejudice. The court did not err in overruling this motion to quash the indictment. Villa v. State, 63 Texas Crim. Rep., 537.

In this connection appellant has quite a lengthy bill giving the questions and answers to the several witnesses on this hearing of the motion to quash, wherein he complains that the court erred in sustaining the State's objections to various questions to the several witnesses, claiming that the appellant should be given the widest latitude in attempting to develop the fact of race prejudice as claimed by him. We have carefully considered his bill on this subject. In our opinion the court's action in every instance was correct. Wherever he claimed in said bill that the court improperly sustained the State's objections to his questions, it fails to state what the answer of the witness would have been. We think neither of his objections are tenable. In our opinion not only the bill fails to show any error, but taking that alone it shows that he was given the widest and greatest latitude that could reasonably have been claimed and that the court, by none of the actions complained of, prevented him from in any and every proper way developing the facts on the question involved. Again, going to the evidence itself on the subject, it shows that the court gave him the widest latitude that could reasonably be claimed and that from the several witnesses he had the opportunity to develop and prove, on the point at issue, every fact that was or could have been pertinent to the question under investigation.

The case was called for trial on June 10, 1912. The appellant then filed his motion for a fourth continuance on two grounds: First, that he was too sick to then undergo a trial; second, on account of the absence of a witness, Nellie Harp, who resided in Franklin County. The court not only heard evidence on this motion for a continuance, but also again heard evidence on that ground when the motion for new trial was heard. The State by proper pleading denied and contested

both appellant's motion to continue at the time it was filed and heard, and also the motion for new trial at the time it was heard and acted upon. We have carefully read and considered all of this evidence. As to his first ground, the evidence as a whole shows that, while appellant .was afflicted with some syphilitic disease, he was not too unwell from that cause, or any other, to then undergo the trial and that he did then undergo the trial without any breakdown, or without resulting in any such state of facts as to show that he was too unwell to then try the case. In fact, the evidence authorized the judge to believe, as he did, that the appellant was in such condition as justified the court to then require him to try the case. As to the second ground, the application, nor the record shows any diligence whatever to procure the attendance of the said Nellie Harp. Besides this, on this ground, the State showed that there were then in attendance numerous witnesses who knew and could have testified fully and completely to everything he claimed he could prove by the absent witness. Again, he had ample time after his motion for new trial was overruled to have procured the attendance of said witness if he had used any diligence whatever to secure her attendance.

By another bill it is shown that Judge Peck was the judge of the District Court of Grayson County, wherein this case was pending and tried; that he was disqualified to try the case; that it was agreed between him and Judge Pearson, Judge Pearson being the judge of the District Court embracing both Grayson and Collin Counties, should try this case, the two judges exchanging at the time of the trial; that some time in March, 1912, the county attorney of Grayson county wrote to Judge Pearson, who resided in McKinney, Collin County, requesting him to come to Sherman, in Grayson County, and in Judge Peck's court, make an order for a special venire, have a special venire drawn and the proper writ issued and set this case for trial. Thereupon Judge Pearson went to Sherman for that purpose. Judge Peck's court, at the time, was in session and open, and Judge Peck was just winding up the trial of a civil case. One of the attorneys therein was arguing the case before the jury, perhaps, making the last argument. Judge Pearson informed Judge Peck of the object of his being there, and, upon conference between them, Judge Pearson suggested that Judge Peck suspend the trial of the civil case so that he could then make the order for a special venire, have it properly drawn and the writ issued therefor, and make the order setting this case for trial at the first day of the text term of Judge Peck's court. After consultation between them they both concluded that that was unnecessary; that Judge Pearson could sit in the district clerk's office in the courthouse and then and there do all that, was necessary for said purpose. Judge Peck thereupon retired from the district clerk's office and went into his own private room in the courthouse, and therein remained until Judge Pearson had concluded his said business in connection with this case, which he then and there did. Neither the appellant nor any of his

attorneys were present when Judge Pearson made the order for said special venire, had it properly drawn, the writ issued and the order made setting this case for the particular day of the next term of the court. However, before, or just about the time Judge Pearson had concluded his said action, one of appellant's attorneys appeared in the clerk's room, where Judge Pearson and the clerk were. Judge Pearson thereupon informed him of what was being done and had been done about said matters. Appellant's attorney thereupon stated to Judge Pearson that he excepted to everything that Judge Pearson had done and was doing in the matter. No specific grounds of objection were then made. He simply excepted to everything. The bill presenting this matter was expressly refused by Judge Pearson, but he stated that he permitted it to be filed as an answer in reply to the motion of the county attorney. It has been so uniformly held in this State that the special venire can be ordered, the veniremen drawn and the writ issued and a criminal case set for trial, without either the defendant or his attorney being present that it is unnecessary to collate the cases. Pockett v. State, 5 Texas Crim. App., 552; Cordover v. State, 6 Texas Crim. App., 207; Gaines v. State, 53 S. W. Rep., 623.

We have failed to find any decision of this, or the Supreme Court, directly in point to the effect that Judge Pearson, as is shown above that he did, could hold court in this case in a different room in the courthouse at the same time when Judge Peck had a case on trial in the same court in another room of the courthouse, and appellant's attorneys have cited us to no case in point. As shown above, Judge Peck was disqualified to sit in this case, and had so informed Judge Pearson and had him to take charge of the case, and ultimately, for that purpose, exchanged districts, or courts, with him. There can be no reasonable ground why these two courts, or two judges, should not sit at the same time in the same courthouse in this case. No possible injury could occur, or did occur, to appellant in this case by reason thereof. It would certainly be senseless, as we see it, to hold that they could not do so. There was no possible conflict between them, neither had to use the machinery of the other then in use by the other in the trial of the respective cases, or in making any orders that were made therein. In Niagara Ins. Co. v. Lee, 73 Texas, 641, our Supreme Court held that while a special district judge was engaged in the courtroom trying a cause in which the district judge was disqualified, the district judge in another room could hear and grant a motion for new trial in another case; that the order of the regular judge was perfectly legal. In 1889, the Legislature passed an Act dividing Dallas County into two judicial districts and made the dividing line pass through the center of the courthouse. The Act contemplated that both said District Courts should be held in one courthouse in the portion thereof in their respective districts. Thereafter the courthouse of Dallas County was destroyed, the Commissioners Court rented another house to be used for courthouse purposes, which house was located entirely within the ter-

ritorial limits of one of said districts. The Supreme Court, in Wheeler v. Wheeler, 76 Texas, 489, held that both of said courts were legally held in such rented building, though it was in one of the judicial districts exclusively. In Lytle v. Halff & Bro., 75 Texas, 129, the Supreme Court held that the Act of the Legislature providing for two District Courts in Bexar County was legal, and that two courts could sit there as well as one. In Daniels v. Bridges, 73 Texas, 149, a special district judge, appointed to try a case, appeared at the courthouse on the day fixed for the trial. The regular court was in session and the judge presiding declined to give way to the special judge. The special judge thereupon went into another room of the courthouse and proceeded to try the case wherein he was special judge. Not being able to obtain a list of the jurors in attendance for the week from the other judge, he ordered the sheriff to summon a jury for the cause. The Supreme Court in that case held that his action in summoning a special jury was unauthorized, and reversed the case for that cause. Evidently the Supreme Court was of the opinion that both courts, being held at the same time, were perfectly legal, otherwise they would have reversed the case on that account. The implication, therefore, is clear that the Supreme Court was of the opinion that both judges could hold court in the same building at the same time. So in this case, we are clearly of the opinion that the action of Judge Pearson in ordering, having the venire drawn, the writ issued and setting this case for a certain day of another term, was perfectly legal and proper, although Judge Peck was trying another case in another room in the same District Court at the same time.

The State proved by Hon. C. T. Freeman, the county attorney of Grayson County, that appellant voluntarily, and after being duly warned by him, made and signed a written confession, which was produced, identified and introduced in evidence. It is as follows:

"Sherman, Texas, November 3, 1910.

"My name is Carl Oliver. I have been at this time warned by C. T. Freeman, the person to whom this confession is made, that I am charged with the murder of Bob Stanley in Franklin County, Texas, in June of this year, and, first, that I do not have to make any statement at all, and, second, that any statement I may make may be used in evidence against me upon my trial for the offense concerning which the confession is herein made, and I now voluntarily make the following statement and confession: I knew Bob Stanley. Had known him a pretty good while. I don't know just how long. I killed him by shooting him with a shotgun in the night. He was on the outside of Mrs. Majors' fence in Mount Vernon. He was just standing up there at the time I shot him. Him and my wife were standing up together. I heard something snap. I did not see him with any arms of any kind. I don't know how far away from me he was when I shot him, but I was close to him, eight or ten feet. Nothing was between him and me

at the time. I got the gun at Sam Petty's, where I was working. It was loaded when I got it. I looked into the gun to see if it was loaded. I got the gun a short time before I shot him; thirty minutes, I judge. Immediately after I got the gun I went back to Mrs. Majors'. I just went up where I had been catching Stanley and my wife going out there to the barn and thought I might catch them that night. When I got to Mrs. Majors' with the gun I went about where I was when I did the shooting. I could see them from there if they went to the barn. It was starlight; no other light. They were out of the yard; had come out of the back gate and come up to where I was sitting. I was sitting down flat. I aimed to kill them both if they went to the barn. I did not hear them say anything. They were standing pretty close together. I could not tell that they were doing anything except standing there. I had been down there before that night. Had seen my wife. She and I had talked a while. She sent for me to go down there. That is the way I came to go. She had said nothing to me about Mr. Stanley. I had talked to her before that about Stanley and she did not deny that she and he were doing business. The only reason I had for shooting him was that I heard him pull a gun and thought he was going to kill me. I did not shoot him because of anything he had said or done to my wife. I knew he had been fooling with my wife. That's another reason. It had been about two weeks since I first spoke to her about doing business with Stanley. I had frequently seen him since I knew he was having intercourse with my wife. I had told C. C. Dupree that my wife was fooling around that way. This was some time before the shooting. I don't know how long."

The effect of Mr. Freeman's testimony on cross-examination was that in taking the confession he asked appellant some questions. What questions were asked or answers thereto given is in no way disclosed or attempted to be disclosed by appellant. Nothing in the evidence indicates that there was any persuasion or coercion by Mr. Freeman or anyone else to induce appellant to make said confession. Appellant's sole objection to the introduction of said confession was that it was not a voluntary statement, but was made in answer to questions propounded by the officer. This contention has uniformly been held against appellant by this court. Tidwell v. State, 40 Texas Crim. Rep., 38; Carmichael v. State, 54 S. W. Rep., 903; Bailey v. State, 26 Texas Crim. App., 706.

Appellant complains that the court excluded the testimony of R. A. Foster to the effect that Foster met Arthur Majors coming from where the deceased had been killed, and he asked Majors what the trouble was about, and that Foster would have testified that Majors then told him that Carl Oliver had killed Bob Stanley, and that the witness then asked him what about, and that Majors said, "Oh, something about his wife." This proposed evidence by Foster was excluded by the court on the objection of the State that it was hearsay. Appellant's conten-

tion is that it was res gestae. The court in qualifying the bill stated: "The testimony introduced before this matter arose showed that the witness, Arthur Majors, was not present at the time of the homicide." Clearly this was hearsay and no part of the res gestae, and the court correctly excluded it.

By a very meager bill appellant complains that the court refused to permit him to show by D. H. Holly, sheriff of Franklin County, that his (the sheriff's) wife told him some time after the killing of deceased that someone called for him. This was excluded by the court on the objection of the State that it was hearsay, and clearly it was hearsay. The appellant when he testified swore that soon after the killing he went to the sheriff's house to give himself up and called for the sheriff, and that Mrs. Holly came to the door and told him that the sheriff was not at home, and that he heard the people coming looking for him and he was afraid that they would mob him and he left and got away. This bill is too meager to require this court to pass upon the question. If we could look to the record it would show that appellant himself not only testified he went to the sheriff's house and called for the sheriff, and that the sheriff's wife told him he was not there, but also proved by Mrs. Holly, the sheriff's wife, that many people, all during the night, came to the sheriff's house calling for him and that she was answering phone calls for him all night; that in fact, she did not go to bed that night; that she did not know who any of the parties were who came to the house calling for the sheriff, but that she told all who did come and call that the sheriff was not there. Clearly this was all that the appellant was entitled to prove on this subject. That the sheriff's wife afterwards told him (the sheriff) that people were calling for him that way all that night, but that she didn't know who they were, was clearly hearsay and inadmissible.

Appellant complains that the court would not permit him to prove by Sheriff Holly that he knew the general reputation of Lizzie Oliver, appellant's wife, at the time of the killing, and that such reputation was that of a white man's negro, and that she had the reputation of having illicit intercourse with white men. The court sustained the State's objections to this testimony. The judge in qualifying the bill, stated that defendant's wife was not offered as a witness by either the State or the defendant. Under the circumstances of this case this evidence was correctly excluded.

The State was permitted to prove by Mrs. Amelia Majors and Mrs. Mary Majors, that they heard Jim Majors tell Lizzie Oliver, wife of defendant, to come out and go to the sheriff's house, to which appellant objected on the grounds that it was not in his hearing and is not shown that he did hear it, and not shown that he had any knowledge of such purpose, and that said testimony was an attempt upon the part of the State to show that defendant did hear the conversation. The bill then further recites that other testimony in evidence showed that at the time of the killing defendant was at least forty-six feet away from the

place where Jim Majors stood when he spoke to Lizzie Oliver, and that there was a small house, nine by twelve feet, and eight by nine feet high directly between where Jim Majors stood and where defendant was at the time of the killing, and that a picket fence also intervened; that the defendant contended that there was no testimony to show that he was there when Jim Majors spoke to Lizzie Oliver; that the Mrs. Majors were about the same distance from Jim Majors when he spoke to Lizzie Oliver as to the place occupied by defendant when the shooting occurred, but there was no obstruction of any kind between Jim Majors and the Mrs. Majors. The court, in approving this bill, qualified it by attaching a diagram of the location of the killing and all the surrounding premises which fixes the point where appellant was hid, lying in wait, from which point he arose and killed the deceased by shooting him in the side when the deceased was in six or eight feet of him. It shows that where he was thus secreted was forty-six feet to the point where Jim Majors stood when he was calling, in a loud tone of voice, appellant's wife out of the servant's house, where she was at the time with the door closed, and that the Mrs. Majors and Jim Majors, who testified to his calling appellant's wife, which was heard by them, that they were thirty-nine feet distant from where Jim Majors stood when he called. That Jim Majors called in a loud tone of voice. As a part of the same qualification the court attaches the confession of appellant copied above. That the evidence shows that the appellant got the gun with which he did the killing at a house about 350 yards from the scene of the killing; that the Majors house, where the killing occurred, is a two-story house, and that night was lighted with incandescent electric lights for a party that was held and that every room in the house was thus lighted, the light coming from the doors and windows and lighted up the back yard; that immediately after the words spoken by Jim Majors the last time, Lizzie Oliver (appellant's wife) came out of the servant's house, walked to the south side of the Majors residence, going to the gate leading out of the yard onto the street. That there was nothing to obstruct appellant's view except a greenhouse, a small building nine by twelve feet and eight or nine feet, as shown in the drawing which he attached; that the words spoken, complained of in the bill, were immediately before the homicide,—that is, within the period of time required for the witness, Jim Majors, Lizzie Oliver, and deceased to walk across the back yard from the servant's house and back along the fence outside of the yard to the scene of the killing without stopping, a distance of sixty-seven feet from the gate; that the appellant testified he saw the deceased and Lizzie Oliver as they came through the gate but did not see them prior to that time; that the testimony showed that the three parties, Majors, Lizzie Oliver and the deceased, did not stop after they started until the shooting occurred; that immediately preceding the killing appellant was shown to be sitting on the outside of the Majors yard fence at its southwest corner, from which he arose at the time he fired the shot; that he charged the jury that Mrs. Mary, Mrs.

Amelia and Jim Majors were permitted to detail the statement alleged to have been made by Jim Majors to Lizzie Oliver, giving the substance of it, and instructed them that they could not consider said evidence for any purpose, unless they believed from the evidence, beyond a reasonable doubt, that such statement was heard by the defendant and if they did not so believe that the defendant heard it, to absolutely disregard said evidence.

In this connection we think it proper to show some further of the evidence. Appellant and his wife had been separated for several months. She was living, and it appears was a servant, at the Majors home, and lived or stayed with her uncle and aunt in the servant's house in the back yard of the Majors place. Appellant claims that his wife Lizzie sent for him that night and that he went into the back yard of the Majors home to see her in response to her invitation. This occurred about 8 o'clock. Some disturbance arose between him and his wife at the time. He caught hold of her, had a knife in his hand, and the uncontroverted testimony shows that Mrs. Majors and perhaps others interfered, believing, and apparently his wife believing, that he intended to cut and kill her with the knife. Mrs. Majors, in response to and because of the difficulty, went into the back yard where the parties were, and repeatedly ordered the appellant away from her premises. He was sullen, showed to be out of humor and would not leave until she had repeated her order to him to leave several times. The deceased and Jim Majors, with their wives, were living at this Majors home. The parties believed from what had occurred that Lizzie Oliver was in imminent danger from appellant that night. After this row between them, and after appellant left upon Mrs. Majors' repeated command, Lizzie went into the servant's house, where her uncle and aunt stayed, closed the door and remained therein. The parties at Mrs. Majors' house became so uneasy for the safety of Lizzie that they interceded with the sheriff and tried to get him to come down and take charge of the negro woman, or do whatever was necessary for her protection. The sheriff, for some reason, did not then go down to Mrs. Majors to see about it. They thereupon concluded that the best thing to do was for Jim Majors and the deceased, both grown men with families, as stated above, to take the negro woman themselves and accompany her to the sheriff's house so that he could see to her protection there. So that about or shortly before 10 o'clock both the Mrs. Majors, the deceased and Jim Majors went into the back yard and Jim Majors called the first time to the negro woman in a loud tone of voice to come and go with them to the sheriff's house. The negro woman made no immediate response. Jim Majors, it seems, for the protection of the woman, then went across a seventy-five-foot lot to a neighbor's and borrowed a pistol, coming back almost immediately; was gone only five or ten minutes. Upon his return the two Mrs. Majors, Jim Majors and the deceased were still in the back yard, and it was then that Jim Majors again called the negro woman to come with them and go to the sheriff's home, that they were ready to go. The

sheriff lived only a short distance away; that immediately after Jim Majors called the woman this second time she came out of the servant's house for the sole purpose of accompanying deceased and Jim Majors to the sheriff's house. The three parties, in single file, deceased in the lead, the woman in the middle and Jim Majors just behind her, separated only eight or ten feet from one another, walked from the servant's house to the back of the Majors house, then turned practically at right angles, passed around the kitchen of said house, out of sight temporarily of the Mrs. Majors, onto the sidewalk of the street, only sixty-seven feet from where appellant then lay hid and secreted. In this single file and about this same distance apart, the deceased, the woman and Jim Majors walked up the sidewalk directly to where appellant lay hid, to pass the lot gate where he was hid, and to pass around the premises so as to reach the sheriff's place. Just as deceased got, as appellant himself says, eight or ten feet from him, appellant suddenly arose from his hiding place with his double-barrel shotgun and shot the deceased in the back, killing him instantly. He then ran first around into the servant's house on the Majors place. Evidently supposing that his wife, after the shooting, would make for that place. Instead, she ran into the Majors house. Appellant not finding her therein, came out of the servant's house and shot then at either his wife or Mrs. Majors,—probably Mrs. Majors. Then ran out of the back side gate of the Majors place and made his escape. The whole town became at once aware of what had occurred and turned out and sought to find appellant. He made his escape, although hunted from day to day by a large number of citizens and was not arrested until some weeks later when he was caught in Houston, Harris County.

The evidence convinces us that the appellant heard Jim Majors at both times when he called his (appellant's) wife to go with them to the sheriff's house and he saw and knew that that was what the deceased and Jim Majors were doing at the time he arose from his hiding place and with malice in his heart, shot and instantly killed deceased. The court did not err in admitting the said testimony objected to by appellant. Lagrone v. State, 61 Texas Crim. Rep., 170, and authorities there cited.

In some respects the record in this case is a remarkable one. It is very voluminous, having several hundred full pages of typewritten matter. There were a large number of motions made, covering every feature of the case. The State contested and filed answers to every motion that was made. The court heard evidence and had witnesses who testified on the hearing of every motion.

Among other motions, appellant moved to quash the first special venire in this case, because only eighty men were drawn and fifty-four of those summoned, and only ten of those who had been summoned answered the call. Some who were summoned were properly excused, one had died and several were out of the State. Appellant in no way sought any attachment or any other writ to bring in any of the special

veniremen who were summoned who did not attend. The State contested the motion on many grounds set up in the county attorney's answer thereto. It is unnecessary to state them. The court overruled appellant's motion to quash the venire, and did so correctly. Thereupon, the court ordered, as another special venire, the officers to summon fifty talesmen to appear the next day. At the time Judge Pearson swore only two deputies sheriff. At the first of the term, however, Judge Peck had sworn the sheriff and all of his deputies as required by law, instructing them in their duty in case they summoned talesmen. It appeared that in the summoning of the talesmen not only the two deputies whom Judge Pearson swore at the time, but the sheriff and two other deputies helped to summon various of these talesmen. The evidence taken on the hearing shows that they did so properly; that they in no way violated their duty and that they in every way discharged properly their duty in summoning these talesmen. In addition, the testimony heard shows that the jury that tried this case was procured from the veniremen and talesmen so summoned without any objectionable juror being forced upon appellant, and that the jury was selected and made up without the appellant exhausting his peremptory challenges. No injury whatever is shown or attempted to be shown to appellant by any action of the court had in these respects. No error is shown in the action of the court. The sheriff and his deputies having been sworn at the beginning of the court by Judge Peck, the judge thereof, it was unnecessary to swear any of them again, even though Judge Pearson did have two of them again sworn when he ordered the talesmen. Habel v. State, 28 Texas Crim. App., 588. It is unnecessary to cite other authorities.

There are many complaints of various single words and then of several together, and of some paragraphs of the court's charge. We have carefully considered all of these. Not one of them, in our opinion, shows any error. Most of appellant's complaints are more than ordinarily hypercritical. We think no useful purpose could be served by taking any or all of them up and discussing them.

The court gave an unusually full, clear and apt charge on every question that was necessary or proper to be submitted to the jury. He charged and submitted murder in the first and second degrees, manslaughter, self-defense, and justifiable homicide on the theory that appellant may have believed, as he testified, that his wife was going with the deceased to the barn to have sexual intercourse with him and that he may have had intercourse with her some two weeks before. The jury were clearly justified in believing his evidence along this line was wholly fabricated. He testified that some two weeks before this homicide he saw deceased and his wife go into the barn back of the lot on the Majors place; that he followed them, and that he got within five or six feet of them and saw them having sexual intercourse. He made no assault on either at the time, nor attempted to do so, according to his own testimony. He was lying in wait with a double-barrel

shotgun in the very gate where he said his wife and the deceased must necessarily pass through in order to get to the barn from the street where he supposed at the time he shot and killed deceased they were intending to go for the purpose of having sexual intercourse. The testimony, with his own confession, establishes, without doubt, that after the attempted assault upon his wife, about 8 o'clock that night, after which time he indicated his intention to cut and kill her, but being interfered with, went off, armed himself with a double-barrel shotgun, came back and secreted himself where he could practically see and hear, and did see and hear everything.that went on in the back yard and lot of the Majors place that night. That he knew and saw and heard, at the time, Jim Majors call to his wife and had her to come out of the servant's house so that he and deceased could go with and take her to the sheriff's house for protection against him, and that they were going with her for no other purpose and with no other intention, and that appellant, lying in wait, seeing them coming, waited till his victim got within eight or ten feet of him, then without one word uttered by either party, arose, shot his victim in the side, instantly killing him, and would have then doubtless immediately killed his wife, but he himself was then shot at by Jim Majors. His wife ran from the scene into the Majors house for protection; he then retreated through the lot gate, where he had been hiding, through another gate leading from the back yard at the servant's house into the barn lot, went into the servant's house hunting his wife, doubtless for the purpose of then killing her, failing to find her there and seeing her or Mrs. Majors at the back of the Majors house, shot at one or the other of them, then fled, secreted himself and escaped arrest for some weeks.

The court in his charge fully and correctly submitted his claimed self-defense. There seems to be no complaint in any way of this charge. The court then submitted manslaughter in every way as favorably to appellant, if not more so, than the law and the facts justified. Then he plainly told the jury that if appellant shot and killed the deceased, but at the time deceased was in company with his (appellant's) wife, and he believed, viewed from his standpoint at the time, that the deceased and his wife were going to the barn to have improper relations with each other, and so believing he killed deceased, to acquit appellant, or if they had a reasonable doubt from the evidence whether or not appellant believed that his wife and deceased were about to have improper relations with each other, to acquit him.

The court covered every ground, where appellant requested special charges, by his main charge so far as any such special charge was correct, or called the attention of the court to any proper or necessary question in the case. The evidence did not raise and did not call for any charge on mistake. His defense of justifiable homicide because of the conduct or supposed intended conduct of deceased with appellant's wife, was fully and amply sufficient.

One ground of appellant's motion for new trial is the claimed mis-

conduct of the jury in discussing the Wood Maxey case, after their retirement, and while the jury was considering this case. The State, as in every other motion made by appellant, answered it and contested it from every standpoint. The court heard evidence on this ground, as others, of the motion for new trial. The claimed discussion by one of the jurors of the Wood Maxey case was positively disproven by the other eleven jurors, and when this one juror himself was put upon the stand his evidence on the question was so mixed and uncertain as to in no way tend to establish, against the other eleven, that the Wood Maxey case was mentioned or discussed by the jury. Every other ground impeaching the verdict of the jury for some claimed misconduct was not only failed to be established by the appellant, but was disproven by the State on the hearing of the motion.

It is but proper to say that the appellant's attorneys were appointed by the court and their labor herein was a labor of love. They fought with vigor every proceeding in the case and raised every question, it occurs to us, that was even remotely suggested by any and all the proceedings in the case in the trial unfavorable to appellant. While they did not make a successful fight, so far as we are able to judge from this record, and we think it is very full, they ably represented their client and skilfully managed his case equal if not superior to what any other attorney could or would have done.

We have given the case, because of the infliction of the death penalty, a patient, careful and thorough consideration. In our opinion there is not only no reversible error in the prosecution, trial and conviction of the appellant, but there is no error. The appellant has had a full, fair and impartial trial, by a fair and impartial jury. His guilt, we think, is shown beyond the shadow of a doubt, and while the penalty is the highest known to our law, this court can not do otherwise than affirm this judgment.

*Affirmed.*

[Rehearing denied June 4, 1913.—Pending on writ of error in Supreme Court, United States.—Reporter.]